IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| ISUZU MOTORS AMERICA, LLC, | CIVIL NO. 13-00306 DKW-KSC |
| Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| vs. | |
| CLARENCE E. JACKSON; JJCO, INC.; JJCO PROPERTIES, LLC; DOE DEFENDANTS 1-100, | |
| Defendants. | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

## INTRODUCTION

The Court conducted a non-jury trial in this case on April 1-2, 2015. Dkt.

Nos. 138, 140.  In May 2015, the parties submitted proposed Findings and

Conclusions.  *See* Dkt. Nos. 149, 150, 152.

---

[1]Pursuant to Federal Rule of Civil Procedure 52(a), the following constitute the Court's Findings of Fact ("Findings") and Conclusions of Law ("Conclusions").  To the extent any Findings as stated may also be deemed to be Conclusions, they shall also be considered Conclusions. Similarly, to the extent any Conclusions as stated may be deemed to be Findings, they shall also be considered Findings.  *See In re Bubble Up Del., Inc.*, 684 F.2d 1259, 1262 (9th Cir. 1982).

Some Findings and Conclusions relate to more than one subject matter heading.  Where that is the case, it is not repeated.

## OVERVIEW

JJCO, Inc. ("JJCO") operated car dealerships on Oahu, including Jackson Isuzu and Jackson Volvo.  In 2010, this Court awarded $303,892.43 in attorneys' fees and costs to Isuzu Motors America, LLC ("Isuzu") after successfully defending a lawsuit brought by JJCO.  *See JJCO, Inc. v. Isuzu Motors America, Inc.,* CV No. 08-00419 SOM-LEK, 2010 WL 4272980, at *7 (D. Haw. Oct. 21, 2010).  Unable to collect on the award of attorneys' fees and costs due to JJCO's claimed insolvency, Isuzu filed the instant lawsuit against JJCO, Clarence Jackson ("Jackson"), and JJCO Properties, LLC ("Properties").  Jackson owns and controls both JJCO and Properties.

Isuzu filed its First Amended Complaint on November 8, 2013.  Dkt. No. 16.  Jackson moved for judgment on the pleadings on all counts, which the Court largely denied, except to the extent that Isuzu sought relief under the theory of equitable subordination pursuant to the bankruptcy code.  Dkt. Nos. 42, 48.  Following that order, Isuzu filed a Second Amended Complaint ("SAC") on October 8, 2014, revising its initial four counts.  Dkt. No. 55.

Counts I and II allege that, pursuant to HRS Chapter 414 and the Hawaii Uniform Fraudulent Transfer Act ("HUFTA"), HRS Chapter 651C, Isuzu is entitled to disgorgement of all shareholder distributions made by JJCO to Jackson after Isuzu was awarded its fees and costs.  SAC ¶¶ 19-26.  Count III asserts that

2

Isuzu is entitled to disgorgement of any payments made by JJCO to Jackson that are categorized as repayment of debt because Jackson did not actually loan money to JJCO, and if he did, it was equity investment which Isuzu is similarly entitled to disgorge.  SAC ¶¶ 27-31.  Count IV alleges a civil conspiracy between JJCO, Jackson, and Properties to perform each of the acts described in Isuzu's other counts.  SAC ¶¶ 32-34.

Both Isuzu and Jackson moved for summary judgment on all of the claims contained in the SAC.  Dkt. Nos. 67, 72.  On March 3, 2015, the Court denied both Isuzu and Jackson's motions because there was material conflicting evidence and genuine issues of material fact as to all remaining claims.  Dkt. No. 102.  As such, the remaining claims proceeded to trial.

Based upon the testimony and exhibits received into evidence at trial, and after full consideration of the legal arguments of all parties, and by a preponderance of the admissible evidence, the Court finds that JJCO made illegal shareholder distributions to Jackson that are subject to disgorgement. Additionally, the Court finds that justice requires that the corporate fiction be disregarded and judgment be entered against JJCO, Jackson, and Properties. Because the Court finds in favor of Isuzu on these two theories of liability, each which would independently entitle Isuzu to the relief it seeks, the Court finds it

unnecessary to address Isuzu's remaining theories.  Isuzu is entitled to the amount

of $303,892.43 plus interest accrued through the date of entry of Judgment.

## FINDINGS OF FACT

### I.  Overview

1. On October 21, 2010, the United States District Court for the District

of Hawai'i entered judgment (the "2010 Judgment") in favor of Isuzu and against

JJCO, a Hawai'i corporation, in the amount of $303,892.43 after successfully

defending a lawsuit brought by JJCO in this Court.  *See JJCO, Inc. v. Isuzu Motors*

*America, Inc.,* CV No. 08-00419 SOM-LEK, 2010 WL 4272980, at *7 (D. Haw.

Oct. 21, 2010).

2. JJCO did not appeal the 2010 Judgment.  As such, the 2010 Judgment

became final.  *See Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 617 (9th Cir.

1993).

3. JJCO has never paid any principal or interest owed under the 2010

Judgment.

4. The stock of JJCO is owned 100% by Jackson.  Jackson is the

President and Secretary of JJCO.  JJCO has no other officers.  Dkt. No. 146 (Trial

Day 1) at 17.

5. Jackson is the sole trustee of the CEJJ Trust.  Dkt. No. 146 (Trial Day

1) at 17-18.

6.     The CEJJ Trust owns 100% of Properties, a Hawaiʻi limited liability company.  Properties does not have any Board of Directors or officers.  Dkt. No. 146 (Trial Day 1) at 17.

7.     Other than a landlord-tenant relationship, there is no contractual or business relationship of any kind between JJCO and Properties.  Exh. C-50 at 38. JJCO, as tenant, has paid no rent to Properties since 2011.  Debbie Tesoro ("Tesoro") 06/07/11 Deposition ("Depo") at 11.

8.     Jackson acknowledged that JJCO did not participate in any of the traditional corporate formalities, including holding regular shareholder and directors meetings, or preparing meeting minutes.  Exh. C-50 at 5-6.  Jackson recalled that there had been only two JJCO Board of Directors meetings within the past five years.  Exh. C-50 at 6.

9.     In 2012, JJCO sold its Volvo Honolulu dealership, which comprised substantially all of JJCO's assets, to Envy Hawaiʻi LLC ("Envy") (the "Envy Sale").

10.     The proceeds of the Envy Sale totaled $4,412,239.  Approximately one-third of the proceeds ($1,536,027) went to satisfy JJCO's debt to First Hawaiian Bank ("FHB").[2]  Exh. C-10 at 4.

---

[2]An amount of $212,239, representing post-closing payments, was deposited to JJCO's FHB account.  Exh. C-10 at 4.

11.    The balance of the proceeds of the Envy Sale (a total of

$2,663,972.73) were distributed as follows:

| $250,000.00 | Paid directly to Jackson (June 2012). |
| $577,500.00 | Paid to FHB in satisfaction of Properties' debts to FHB (November 2012). |
| $78,028.35 | Paid to FHB in satisfaction of Jackson's personal debt to FHB (November 2012). |
| $458,444.38 | Paid directly to Jackson's personal checking account at FHB (November 2012). |
| $1,300,000.00 | Paid directly to Jackson (December 2012). |

Exh. C-10 at 4.

12.    Isuzu alleges that it has been unable to collect on the award of

attorneys' fees and costs because JJCO has represented that it is insolvent.  Isuzu

further alleges that to the extent JJCO is insolvent, its insolvency was caused by

improper shareholder draws, distributions, and payments to Jackson and

Properties, including from the sale of JJCO's assets to Envy.  According to Isuzu,

Jackson, in effect, treated JJCO as his personal bank account and received money

from JJCO whenever he needed funds, including to pay his personal expenses.

Isuzu claims that these funds should be returned to JJCO and used to satisfy

Isuzu's 2010 Judgment against the company.

13.    Jackson's defense is based on his claim that since at least 2005, he

made "loans" to JJCO, which Jackson claims were entitled to priority over Isuzu's

2010 Judgment because of a UCC Financing Statement that he filed in 2008 (the "Financing Statement").  Exh. C-6.  Jackson also claims that the "shareholder distributions" he received were actually "interest" payments on the loans he made to JJCO.

14.     Properties' defense is that JJCO owed Properties rent in the amount of $10,000 per month from the time of JJCO's last payment of rent in January 2011 through 2013 when JJCO ceased operation of the Hilo lot it rented from Properties. Tesoro 06/17/11 Depo at 11:15-25.  This would amount to, at most, $350,000.

## II.     Loans From Jackson to JJCO

15.     In 2004, JJCO distributed $500,000 to Jackson.  The following year, in 2005, JJCO distributed $1.5 million to Jackson.  Exh. C-17.[3]

16.     Jackson used these distributions from JJCO "to construct improvements on the [CEJJ Trust's] Big Island property[.]"  Exh. C-17.

17.     Jackson chose to take distributions from JJCO "rather than obtain a construction loan, to simplify and expedite the construction process."  Dkt. No. 146 at 35-36.

18.     The $2 million in distributions to Jackson in 2004 and 2005 left JJCO undercapitalized, as confirmed by FHB, Jackson and JJCO's bank.  Exh. C-17.

---

[3]Exhs. C-17, C-18, and C-19 are business records of FHB.  They were stipulated into evidence by the parties, and the Court finds that they credibly describe the dealings of JJCO.

19.     No shareholder contribution of capital was ever made to JJCO from 2004 to the present date.  Notwithstanding JJCO's undercapitalization, Jackson admitted that if JJCO ever needed capital, he would simply "loan" JJCO the money.  Dkt. No. 146 at 23:5-8, 25:15-17.

20.     Jackson acknowledged that JJCO's inadequate capitalization did not matter to him or to FHB, because he was also a guarantor on FHB's loans to JJCO.  Dkt. No. 146 at 136-37.  However, Jackson did not agree to act as a guarantor for other creditors.

21.     The funds that Jackson withdrew from JJCO in 2004 and 2005 were used to construct a personal residence for Jackson, which was appraised at $10 million by Robert Bloom on August 25, 2006.  The appraisal was reviewed by FHB on October 25, 2006 and again on August, 6, 2007 with a revised value range of $6.5 to $10 million.  Exh. C-17 at 1.

22.     Jackson testified at trial that the home has a current value of approximately $8 million.  Dkt. No. 146 at 30-31.

23.     Despite JJCO providing $2 million for construction of the house (together with the land it was built on), JJCO did not receive any ownership interest in the house or the land.

24.     In 2007, Properties borrowed approximately $4 million from FHB, which was obtained by mortgaging the Big Island house that was built using JJCO's funds.  Dkt. No. 146 at 30:7-18; *see also* Exh. C-19.

25.     Defendants claim that Jackson took the funds from FHB (obtained by mortgaging the house JJCO paid to construct) and then "loaned" those funds to JJCO.  Dkt. No. 146 at 31:4-11.

26.     Although JJCO did not borrow the money from FHB, Jackson had JJCO make the monthly payments to FHB on Properties' loan.  DKt. No. 146 at 30.

27.     JJCO continued to make the payments to FHB for Properties' borrowing through 2012, when JJCO's Volvo dealership was sold and part of the proceeds from the sale of JJCO's assets went to pay down Properties' loan from FHB.  Exh. C-10 at 4.

28.     JJCO received no consideration from Properties for making the monthly payments on Properties' loan, nor did it receive consideration for paying down the loan when JJCO's assets were sold.

29.     Exhibit C-19 confirms that one of the purposes of Properties' borrowing funds from FHB, using the Big Island house as collateral, was to "recapitalize" JJCO.  However, instead of contributing the loan proceeds to JJCO's

capital, Jackson claims that he and Properties elected to "loan" funds to JJCO at an interest rate higher than the rate Properties was obligated to pay to FHB.

30.     In December of 2007, Jackson signed, on behalf of JJCO, a promissory note in favor of himself in the amount of $1,615,315.20.  Exh. C-3.  In January of 2008, Jackson signed, on behalf of JJCO, another promissory note in favor of himself in the amount of $2,100,000.00.  Exh. C-4.  Jackson testified that all of the money loaned under these notes had already been funded years before these notes were signed.  Dkt. No. 146 at 50:21-51:4.

31.     The total amount of the notes allegedly extended to Jackson by JJCO approximated the total value of all of JJCO's assets.

32.     Jackson testified that even in good years, JJCO was not able to repay shareholder loans because all of its available funds had been distributed to shareholders.  Dkt. No. 146 at 147:2-7.

33.     JJCO thus had no money to pay its debts, except to the extent that Jackson chose to make loans to JJCO.  Jackson explained that "[t]he company didn't have the money because we were taking distributions."  Dkt. No. 146 at 147:8-9.

34.     Because JJCO owed Jackson the value of all of JJCO's assets, JJCO paid only those obligations that Jackson wanted JJCO to pay.  Jackson's loans, in other words, allegedly had priority over all of JJCO's other obligations.

10

35.     The promissory notes dated December 7, 2007 and January 5, 2008 that Jackson caused JJCO to sign in favor of himself make no reference to any security interest or collateral.  *See* Exhs. C-3, C-4.

36.     Jackson acknowledged that no document discussing collateral was signed contemporaneously with the promissory notes.  Dkt. No. 146 at 51:7-52:6.

37.     On September 5, 2008, several years after Jackson claims he made the loans to JJCO, Jackson filed a Financing Statement purporting to secure the promissory notes Jackson had signed on behalf of JJCO in favor of himself dated December 7, 2007 and January 5, 2008.  Exh. C-6.

38.     The description of the collateral in the Financing Statement does not encumber any of JJCO's assets that were sold to Envy.  Dkt. No. 146 at 58:5-8.

39.     There is no evidence that any funds were ever actually delivered to JJCO pursuant to any of the promissory notes.

40.     Isuzu subpoenaed copies of the records of all such "loans," including the documents, records, and cancelled checks reflecting the funds that were loaned. Exh. C-30.  JJCO's employee who is in charge of maintaining such records, Debbie Tesoro, testified under oath that she had produced all such records.  *See* Tesoro 06/17/11 Depo at 79:8-25.

41.     After the sale of JJCO's Volvo dealership was completed, Jackson claimed that he received nothing from the proceeds of the sale.  Jackson claimed

all of the proceeds of the sale went to FHB.  However, as acknowledged by

Jackson's own personal accountant, Jackson and Properties received more than

$2.6 million from the proceeds of the sale of JJCO's assets to Envy.  Exh. C-10.

42.    On the basis of the promissory notes and the Financing Statement,

Jackson paid himself $2.6 million from the proceeds of JJCO's Envy Sale, while

Isuzu and other creditors received nothing.  *See* Exh. C-10 at 4.

III.    **"Shareholder Advances" JJCO Paid to Jackson**

43.    It is undisputed that JJCO has been "insolvent" at all relevant times.

*See* Jackson Declarations contained in Exhs. C-29, C-33, and C-52.

44.    While JJCO was insolvent, Jackson drew a $10,000 per month salary

from JJCO.  JJCO also paid during this time "shareholder draws" to and for the

benefit of Jackson.  Dkt. No. 146 at 65:16-24.

45.    When Jackson needed spending money, JJCO would write a check to

the "lot boy," Jimmy Loeak, who would go to the bank, cash the check, and give

the cash to Jackson.  Tesoro 06/17/11 Depo at 10:8-14.

46.    Similarly, JJCO paid Jackson's personal credit card bills, including

but not limited to American Express and Discover cards, life insurance bills, and

Homeowners' Association maintenance fees.  All of these were treated by JJCO as

"shareholder draws," as confirmed by JJCO's bookkeeper and Federal Rule of

Civil Procedure 30(b)(6) designee, Debbie Tesoro.  *See* Tesoro 06/17/11 Depo at

10:11, 36:18, 37:1-3, 55:14-16, 56:10-11, 67:24-25.

47.    Taryn Schuman, a certified public accountant who runs her own

practice, Taryn R. Schuman, CPA, Inc., testified that she has provided accounting

services for JJCO and Jackson, including preparation of their tax returns.  Dkt. No.

147 (Trial Day 2) at 6-9.

48.    Schuman's report states that the payments to (and for the benefit of)

Jackson that were shown on JJCO's books as "shareholder draw" were re-

characterized on JJCO's tax returns as "interest" on the loans Jackson allegedly

made to JJCO.  Exh. C-10 at 5.

49.    The Court finds that this re-characterization is suspect, and that those

payments were actually "shareholder draws," as contemporaneously described in

JJCO's records.  Indeed, Jackson admitted that he received "shareholder draws" in

his deposition, stating that he would "[o]ccasionally . . . take a couple thousand

dollars cash, but it [would go] against stockholder draw." Jackson 06/01/11 Depo

at 27:13-28:1.

50.    Although like Schuman, Jackson subsequently attempted to re-

characterize that money as "interest" on loans that he had allegedly made to JJCO

in his deposition and at trial, the Court does not give credence to that portion of his

testimony.

51.     From 2009 through 2011, the total amount of "shareholder draws"

that Jackson received (and that Schuman re-characterized as "interest payments" to

Jackson) was $319,422.35.  Exh. C-10 at 7.

52.     In addition to these "shareholder draws," JJCO also paid all of

Jackson and Properties' monthly payment obligations to FHB.  Schuman also

characterized these payments as "interest" on the promissory notes signed by

Jackson on behalf of JJCO promising payments to Jackson.

## CONCLUSIONS OF LAW

## I.     Claims Under the Hawaii Business Corporation Act (HRS Chapter 414)

1.     "The Hawaii Business Corporations Act [("HBCA")] prohibits a

corporation from making distributions to shareholders if it would be insolvent after

the transaction was completed . . . ."  *In re Maui Indus. Loan & Fin. Co., Inc.*,

2011 WL 1870289, at *2 (Bankr. D. Haw. May 16, 2011).

2.     Section 414-111 provides:

No distribution may be made if, after giving it effect:

> (1) The corporation would not be able to pay its debts as they
>     become due in the usual course of business; or
>
> (2) The corporation's total assets would be less than the sum of
>     its total liabilities plus (unless the articles of incorporation
>     permit otherwise) the amount that would be needed, if the
>     corporation were to be dissolved at the time of the distribution,
>     to satisfy the preferential rights upon dissolution of

14

> shareholders whose preferential rights are superior to those
> receiving the distribution.

HRS § 414-111(c).

3.     The parties here dispute whether the first element of this test is

satisfied, but do not dispute JJCO's current insolvency.

4.     The HBCA defines a distribution as:

> [A] direct or indirect transfer of money or other property (except its
> own shares) or incurrence of indebtedness by a corporation to or for
> the benefit of its shareholders in respect of any of its shares.  A
> distribution may be in the form of a declaration or payment of a
> dividend; a purchase, redemption, or other acquisition of shares; a
> distribution of indebtedness; or otherwise.

HRS § 414-3.

5.     The credible evidence at trial established that Jackson received

distributions from JJCO, and that these distributions occurred during a time when

JJCO was insolvent.

6.     For example, in response to the question of whether Jackson received

anything in excess of $1,000 a month from JJCO, Jackson responded that he would

"take a couple thousand dollars" that went "against stockholder draw."  Jackson

06/01/11 Depo at 27:13-18.  Jackson acknowledged that when he would take a

stockholder draw, it was not repayment or partial repayment of the loan he had

allegedly made to JJCO.  Jackson 06/01/11 Depo at 27:23-28:1.

7.     The Court concludes that the evidence to the contrary, e.g., that those payments were actually loan repayments, is not credible or is outweighed by other evidence.  For example, there is no evidence of the loans having been made to JJCO, despite requests directed to Jackson and JJCO to document the transfer of funds.  The promissory notes that evidence the loans were signed years after the loans themselves were purportedly made.  And the recharacterizations of the payments to Jackson as "interest" by both Jackson and his accountant appear to be just that – after-the-fact attempts to avoid disgorgement, such as that sought here. Both Jackson's original testimony and JJCO's contemporaneous records are more reliable and credible evidence of what these transactions truly represented – shareholder draws – and the Court so finds.

8.     The shareholder draws that JJCO paid for the benefit of Jackson in 2009 through 2011 were made in violation of HRS § 414-111(c) and are therefore voidable by Isuzu.

9.     Jackson received $319,422.35 in violation of the law (separate and apart from his $10,000 per month salary), and Isuzu, as a legitimate judgment creditor of JJCO, is entitled to judgment against Jackson and JJCO for the amount of the 2010 Judgment, plus applicable interest.

16

## II.    Alter Ego/Piercing the Corporate Veil

10.    Hawaiʻi uses the alter ego test for determining whether the corporate veil should be pierced.  *Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transp. Co.*, 91 Hawaiʻi 224, 240-43 , 982 P.2d 853, 869-72 (1999), *superseded by statute on other grounds as noted in Davis v. Four Seasons Hotel Ltd.*, 122 Hawaiʻi 423, 428 n.9, 228 P.3d 303, 308 n.9 (2010).

11.    The alter ego doctrine has been used to disregard the corporation as a distinct legal entity "only where recognition of the corporate fiction would bring about injustice and inequity or when there is evidence that the corporate fiction has been used to perpetrate a fraud or defeat a rightful claim."  *Chung v. Animal Clinic, Inc.*, 63 Haw. 642, 645, 636 P.2d 721, 723 (1981).

12.    The corporate entity will be disregarded and the shareholder or officer of the corporation will be held liable for the corporation's debts where (1) there is such unity of ownership that their separateness has ceased; and (2) the facts are such that adherence to the normal attributes of separate corporate existence would sanction a fraud or promote injustice.  *Robert's Hawaii School Bus Inc.*, 91 Hawaiʻi at 242, 982 P.2d at 871.  Both elements have been proven here by a preponderance of the evidence.

13.    In evaluating alter ego liability, there are numerous factors to consider, none of which is independently dispositive.  As to the instant case, some

of the most relevant factors include:  (1) commingling or failing to separate funds; (2) failing to adequately capitalize a corporation; (3) disregarding legal formalities and failing to maintain arm's length relationships among the related entities; (4) having shared directors and officers with supervisory or managerial responsibilities over both companies; and (5) employing the same people.  *See id.* at 241-43, 982 P.2d at 870-72.

14.     First, the credible evidence presented at trial establishes that Jackson commingled funds and treated JJCO's assets as his own.  For example, Jackson withdrew $2 million from JJCO with no documentation and used it to construct a house on the Big Island without JJCO receiving any interest at all in the house. Jackson and Properties then borrowed $4 million against the house and caused JJCO to make all the payments on that $4 million loan even though JJCO had already paid for construction of the house and had no ownership interest in it or the land on which it was built.

15.     Jackson's own testimony in this case confirms that his alleged perfected security interest required JJCO to divert all of its funds to Jackson, except to the extent Jackson consented, or loaned, funds for JJCO to pay its other debts.

16.     As such, Jackson treated JJCO like his personal bank, taking money from JJCO at his convenience without agreeing to pay or actually paying JJCO the money back.

17.     Second, Jackson, JJCO's sole owner, shareholder and officer, failed to adequately capitalize JJCO, as JJCO was undercapitalized at all relevant times. This is evidenced by two different banks several years apart:  FHB in 2007 [Exh. C-17] and Bank of Hawaii in 2012 [Exh. C-24].  According to Jackson, if JJCO ever needed capital, he would "loan" JJCO the money, rather than making a capital contribution.  Dkt. No. 146 at 23:5-8.

18.     Although Jackson claims that JJCO's inadequate capitalization did not matter to him or to FHB, since he was also a guarantor on FHB's loans to JJCO, Jackson still had an obligation to other present and future creditors not to render JJCO undercapitalized by taking ill-advised distributions.

19.     Third, the credible evidence at trial establishes that Jackson and JJCO disregarded legal formalities and failed to maintain arm's length relationships.  For example, Jackson testified that he loaned $1.6 million to JJCO in 2005.  However, there is no evidence that a promissory note was signed for any 2005 loan, and Jackson admitted at trial that, in his mind, he did not need any formal, contemporaneous documentation, such as a promissory note or a UCC financing statement because "the company was doing very well" at the time.  Dkt. No. 146 at

46-47.  Jackson's Financing Statement was not filed until September 5, 2008, and

the earliest promissory note referenced therein is dated December 7, 2007.

20.    Fourth, Jackson not only owns JJCO and Properties, but is the sole

individual in absolute control of both entities.  At trial, Jackson clearly testified

that he was the sole decision-maker for JJCO and Properties as to all things

material at all relevant times.

21.    Fifth, Jackson and JJCO have employed several key individuals.  For

example, Jackson and JJCO have shared the same accountant, Taryn Schuman, for

at least the past fifteen years.  Exh. C-10 at 2.  Jackson and JJCO have also

employed the same attorney, Grant Kidani, Esq., who not only represents Jackson

in the present case, but also filed (1) JJCO's Articles of Incorporation in 1996

[Exh. C-1]; and (2) the Financing Statement purporting to perfect Jackson's

security interest in JJCO's assets [Exh. C-6].

22.    Based on the application of the relevant factors, the Court concludes

that there is such unity of ownership that the separateness of JJCO, Properties, and

Jackson has ceased.

23.    The Court further concludes that adherence to the normal attributes of

separate corporate existence would sanction a fraud or promote injustice.

24.    Adherence to the normal attributes of separate corporate existence

would mean that the shareholder who dominated every aspect of JJCO's affairs

would receive $2.6 million from JJCO's 2012 Envy Sale, while Isuzu, a legitimate judgment creditor, would receive nothing.

25. Jackson, Properties, and JJCO tried to conceal their business activities in an attempt to deprive Isuzu of collecting on its 2010 Judgment. For example, in a sworn declaration dated December 22, 2014, Jackson stated, "First Hawaiian Bank as senior creditor retained all of that money paid by Envy for assets sold to them, and applied it at their discretion. Exh. C-52 at ¶19. Jackson's statement was contradicted by his own expert's report and testimony, which clearly identifies over $2.6 million of the money paid by Envy going directly into Jackson's checking account or paying off Jackson and Properties' debts. Exh. C-10. Jackson's declaration is misleading to this Court and to lawful creditors such as Isuzu.

26. In this case, justice requires that the corporate fiction be disregarded and judgment be entered against JJCO, Jackson, and Properties in the amount of $303,892.43 plus interest accrued through the date of entry of Judgment.

## III. The Financing Statement Does Not Entitle Jackson to Payment Ahead of Isuzu

27. Jackson claims that the basis for "repaying" himself ahead of Isuzu was because he filed the Financing Statement on September 5, 2008, which is prior to the date of Isuzu's 2010 Judgment against Jackson. Exh. C-6. Jackson also claims that his "loans" to JJCO were "secured by" the Financing Statement.

21

28.     The Uniform Commercial Code provides that "a security interest is enforceable against the debtor and third parties with respect to the collateral only if . . . [t]he debtor has authenticated a security agreement that provides a description of the collateral . . . ."  HRS § 490:9-203(b).

29.     As the party alleging a security interest, Jackson bears the burden to establish that a security agreement exists between Jackson, the purported secured party, and JJCO, the purported debtor.

30.     The evidence in this case shows that there is no written security agreement between Jackson and JJCO.  Specifically, no written security agreement was produced by Jackson or by JJCO in response to the subpoena clearly covering it.  Jackson could not recall if JJCO ever signed a security agreement.

31.     Jackson appears to assert that the Financing Statement (Exh. C-6) "for all intents and purposes, functions the same as a security agreement."  Dkt. No. 148 at 18.  However, Jackson's reliance on his Financing Statement is misplaced.

32.     A UCC financing statement does not create a security interest, it merely perfects an existing one.  Moreover, Jackson admitted that his Financing Statement did not encumber the assets that JJCO sold to Envy, and therefore, it cannot be enforced against those assets or their proceeds.

33.     While the Financing Statement references promissory notes dated December 7, 2007 (Exh. C-3) and January 5, 2008 (Ex. C-4), neither note contains any reference to a security interest in any collateral.

34.     In addition, at the time the funds were originally loaned, there was no agreement to provide collateral.  Even if JJCO had subsequently agreed to a security agreement, it could not have been supported by consideration because the money had already been loaned, and Jackson gave nothing new for any collateral.

35.     Because Jackson never had a security interest in JJCO's assets, Jackson was not entitled to priority from the Envy Sale proceeds ahead of Isuzu.

36.     The record is void of evidence showing that JJCO pledged any collateral to Jackson.

37.     There is no security agreement, promissory note, financing statement, lease agreement, or any other form of written documentation reflecting a debtor-creditor relationship between Properties and JJCO.

38.     Therefore, even if the Court were to conclude that Jackson and/or Properties were creditors of JJCO, Jackson and Properties would, at best, be unsecured creditors of JJCO.

39.     Isuzu is an unsecured judgment creditor of JJCO.

40.     Isuzu is entitled to payment from JJCO ahead of both Jackson and Properties.  The general rule that a debtor may prefer one unsecured creditor over

another does not apply where the debtor is an insolvent corporation and preference

is given to an insider of the corporation, such as Jackson.  *See Troy Laundry Mach.*

*Co. v. Sanitary Steam Laundry Co.*, 18 Haw. 388, 389-90 (1907); *see also* HRS §

651C-5(b).

41.    Therefore, any and all sums of money that JJCO distributed to, or for

the benefit of, Jackson out of the Envy Sale proceeds, were improperly distributed.

42.    Similarly, any and all sums of money that JJCO distributed to, or for

the benefit of, Properties out of the Envy Sale proceeds, were also improperly

distributed.  There is no credible evidence that JJCO owed Properties anything.

43.    Accordingly, Isuzu is entitled to judgment against Properties and

Jackson as the improper transferees of proceeds of JJCO's assets.

## CONCLUSION

Based on the foregoing Findings and Conclusions, Judgment shall enter in

favor of Isuzu and against JJCO, Properties, and Jackson, jointly and severally, in

the amount of $303,892.43, plus interest that has accrued thereon since October 21,

2010.  Isuzu may submit a separate request for award of attorneys' fees and costs.

IT IS SO ORDERED.

DATED:  August 31, 2015 at Honolulu, Hawaiʻi.



_____
Derrick K. Watson
United States District Judge

24